## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Thomas Davis, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 06 C 2648 |
| Elite Mortgage Services Inc., | ) | |
| Decision One Mortgage Co., | ) | |
| Mortgage Electronic Registration Systems, Inc.. | ) | Robert Gettleman, |
| Melvin Brooks,  LeAndre Burnett, | ) | Judge Presiding |
| Lorie Westerfield, Esq., Earnest Terrell Rowell, | ) | |
| Johnnie Pierre, NovaStar Mortgage Inc. | ) | |
| and All Unknown Claimants, | ) | |
| | ) | |
| Defendants. | ) | |

### SECOND AMENDED COMPLAINT

Thomas Davis, for his amended complaint against the above-captioned defendants, demands

trial by jury and alleges as follows:

### NATURE OF THE CLAIM

1.    Plaintiff Davis is seeking to recover damages and title to his home, which he lost as a result

of a scheme organized by real estate professionals to use his economic distress, his financial

naiveté and his trust in order to persuade him to sign documents which he believed would

refinance his home, but which, instead, conveyed the home to a third party. As a result of

this transaction that had no rational economic justification, Davis lost the equity he had

created in the home that he has lived in for 49 years and made higher monthly payments that

were both unaffordable and unbargained for.  Because the scheme that victimized Davis

could not have been accomplished without the coordinated activities of mortgage brokers,

real estate brokers, a mortgage lender and an investor all working in concert through

corporate entities and because these real estate professionals have used this scheme to

victimize other elderly, minority homeowners, Plaintiff is seeking to deter Defendants from continuing their fraudulent scheme through the remedies under the Racketeer Influenced Corrupt Organization Act.

## **PARTIES**

2.    Plaintiff Thomas Davis, ("Davis"), a 58 year old retiree, is a resident and citizen of Cook County, Illinois. He has lived in his home at 2737 W. Washington Boulevard, Chicago, Illinois 60612 since 1947. Prior to retiring in 2003, Davis worked for 27 years as a laborer for the Chicago Department of Sewers, now the Chicago Department of Water Management. He has one year of high school education and suffers from asthma, eczema and allergies.

3.    Defendant Elite Mortgage Services, Inc. ("Elite"), also operating under the corporate name Elite Realty Group, Ltd., is a corporation doing business in Cook County Illinois, *inter alia*, as a real estate broker, mortgage broker, real estate investor and property manager. Upon information and belief, Elite's principal place of businesses is 6058 W. North Avenue, Chicago, Illinois 60639.

4.    Defendant Decision One Mortgage Company LLC ("Decision One") is a North Carolina limited liability corporation doing business in Cook County, Illinois, *inter alia*, as a residential mortgage lender.  Upon information and belief, Decision One is headquartered at 6060 J.A. Jones Drive, #1000, Charlotte, North Carolina 28287 and maintains a branch office at 1 East 22nd Street in Lombard, Illinois.  Decision One had claimed a security interest in the property at 2737 W. Washington Boulevard, Chicago, Illinois 60612 through a loan paid to Earnest Rowell secured by a mortgage on the property at 2737 W. Washington Boulevard, Chicago, Illinois 60612. Upon information and belief, Decision One retains profits from mortgage payments made by Davis, as well as from various fees and costs derived from the equity in Davis' home.

5.      Defendant Melvin Brooks ("Brooks") is an individual who, upon information and belief, presently resides in Cook County, Illinois and at all relevant time was an employee and/or agent of Elite Mortgage.

6.      Mortgage Electronic Registration Systems, Inc., ("MERS"), is a Delaware corporation with its principal place of business at 1595 Springhill Road, Vienna, VA.  It is the nominee for the mortgagees in regard to both the Decision One mortgage loan and the NovaStar mortgage loan.

7.      Defendant LeAndre Burnett ("Burnett") is an individual who, upon information and belief, presently resides in Cook County, Illinois and at all relevant time was an employee, agent and/or manager of Elite.

8.      Defendant Lorie K. Westerfield ("Westerfield") is an attorney licensed to practice law in Illinois and at all relevant times her law practice has been located at 410 S. Michigan Avenue, Suite 525, Chicago, Illinois 60605.

9.      Defendant Earnest Terrell Rowell, ("Rowell"), is an individual, who upon information and belief presently resides in Cook County, Illinois, at 1727 N. Merrimac Avenue, Chicago, Illinois 60639.  He purchased, as an investment, purported title to the property at 2737 W. Washington Boulevard, Chicago, Illinois 60612 from Davis.  Rowell has never resided at the property at 2737 W. Washington Boulevard, Chicago, Illinois 60612.

10.     Defendant Johnnie Pierre, ("Pierre"), is, on information and belief, a resident of Cook County, Illinois who purchased purported title to the property from Rowell on or about May 11, 2006 for $345,000.

11.     Defendant NovaStar Mortgage Inc., ("NovaStar"), is a Kansas corporation doing business in Cook County, Illinois, *inter alia*, as a residential mortgage lender.  Upon information and belief, NovaStar is headquartered at 8140 Ward Parkway, Kansas City, MO  64114 and

retains as its agent for service in Illinois C T Corporation system, 208 South LaSalle Street, Suite 814, Chicago, Illinois. NovaStar, on information and belief, claims a security interest in the property at 2737 W. Washington Boulevard, Chicago, Illinois 60612 through a loan paid to Johnnie Pierre secured by a mortgage on the property at 2737 W. Washington Boulevard, Chicago, Illinois 60612.

### JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction under 28 U.S.C.A. § 1331 with respect to the cause of actions alleged in Count XII under the Truth in Lending Act ("TILA"), 15 U.S.C.§§1601, *et seq.;* Count XIII under Home Ownership and Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C. §§ 1602 and 1639, and Counts I and II under the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. § 1961 *et. seq.*  This Court has supplemental jurisdiction under 28 U.S.C.A. § 1367 with respect to the causes of action alleged in Count III (Quiet Title Claim Based on Finding that Davis is an Equitable Mortgagor and Rowell is an Equitable Mortgagee), Count IV (Illinois Consumer Fraud and Deceptive Business Practices Act Claim Against Defendants Elite, Brooks and Burnett), Count V (Common Law Fraud Claim Against Defendants Elite Mortgage, Melvin Brooks and LeAndre Burnett), Count VI (Unconscionability Claim Against Elite, Brooks, Burnett, Rowell, and Decision One Mortgage Company), Count VII (Breach of Fiduciary Duty Claim Against Elite, Burnett and Brooks for their Role as Mortgage Brokers), Count VIII (Breach of Fiduciary Duty Claim Against Elite, Burnett and Brooks for their Role as Real Estate Brokers), Count IX (Claim for Professional Malpractice Against Westerfield), Count X (Unjust Enrichment Claim against all Defendants).

13.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(3) because all defendants are subject to personal jurisdiction in this District.

## STATEMENT OF FACTS

**A.    Davis' Economic Predicament.**

14.    Davis is the rightful owner of the property commonly known as 2737 W. Washington

Boulevard, Chicago, Illinois, 60612 (the" Home"), and legally described as follows:

> Lot 1 in the Subdivision of Lots 27, 28, 29, 30 and the East 16.5 Feet of Lot
> 31 in   Edgar Loomis Subdivision of Lots 4, 5, 6, 7, 14, 16, 17, except the
> West 33 feet of Lots 5, 6, 16, in Turner's Subdivision of Block 4 in the
> Partition of the South ½ of    the South East ¼ of Section 12, Township 39
> North, Range 13, East of the Third    Principal meridian, In Cook County,
> Illinois.
>
> PIN:  16-12-421-008-0000.

15.    The Home is a single family residence, which Davis' family has owned and lived in since

1947.

16.    In 2002, Davis was making regular payments to Ameriquest Mortgage Company

("Ameriquest"), a mortgage lender, on a loan secured by a mortgage on the Home. The

monthly mortgage payments were $990.40.

17.    In February 2003, Davis was advised by his doctor that his severe asthmatic condition was

aggravated by his work as an outdoor laborer for the Chicago Department of Sewers. Davis

was, therefore, advised by his doctor to stop working.  As a result of his loss of employment,

Davis fell behind in his mortgage payments and other debts.

18.    On January 8, 2004, Davis filed for Chapter 7 bankruptcy in order to have all his debts

discharged, with the exception of the Ameriquest mortgage, which had an outstanding

indebtedness that was greater than the Home's then appraised value. The discharge of

Davis's debts pursuant to the April 29, 2004 bankruptcy court order by agreement of the

parties did not include the Ameriquest mortgage.

19.     After Davis again fell behind on his mortgage payments, Ameriquest threatened to foreclose on the mortgage for Davis' home in March 2004. As a result, Davis believed he had until April 16, 2004 to refinance his Home in order to avoid foreclosure.

**B.      Davis' Initial Contacts with Elite.**

20.     In 2004, Elite, advertised to the public that it had expertise in real estate and mortgage financing and mortgage brokering, and that it would use such expertise to "save" the homes of homeowners facing foreclosure.  Upon information and belief, Elite focused the marketing of its home refinancing, or "home rescue," programs on low income communities and targeted the elderly and minority individuals such as Davis.

21.     Davis called Elite in March 2004 because he had been told of Elite's promotion of its programs to save homeowners' homes from foreclosure. Davis was referred to Brooks, who said he was a "mortgage consultant."  After Davis told Brooks that Ameriquest had given him 30 days to refinance his Home, Brooks told Davis not to worry, that they would save his home and get it refinanced so he could continue to live there. Davis felt greatly relieved at this news and agreed to an appointment with Brooks at Davis' Home.

22.     A few days later, Brooks, along with Burnett, met with Davis at his Home. At the meeting, Brooks and Burnett discussed with Davis how they would use their expertise in real estate financing to arrange refinancing of the Home so that Davis could avoid foreclosure and remain in the Home.

23.     Brooks told Davis that he and Elite would arrange a refinancing plan for Davis, and that Davis' new monthly mortgage payments on the Home would be no more than $900.00 - 1,100.  Brooks assured Davis that, although these payments were about $100 more per month than Davis' existing mortgage payments, Davis would benefit, both because the Home would be saved from foreclosure and because Elite's refinancing plan would pay for

home repairs and provide Davis with cleaner credit.

24.   On the basis of Brooks' and Burnett's statements,  Davis understood that Elite would arrange a refinancing of his mortgage debt that would pay off his existing mortgage lender, Ameriquest, and would secure a new loan at a 10-11% interest rate.

25.   Brooks and Burnett intended that Davis rely on their representations as to a refinancing plan, and Davis did in fact rely on such representations in deciding to commit to the real estate financing transaction that Brooks, Burnett and Elite arranged.

26.   Because of Davis' medical disabilities and nearly 60-year attachment to the Home that he desperately wanted to protect from foreclosure, he believed that there was no alternative but to follow the direction of Brooks and Burnett.

27.   Davis' trust in Brooks was deepened by Brooks' assurance that he is a good Christian, who believes in God and who regularly attends church with his wife.

28.   At no point was Davis advised to seek legal counsel.  Instead, when Davis inquired about whether he needed legal representation, Brooks told Davis he did not need an attorney and that Elite would provide an attorney to represent Davis.

29.   At no point during this meeting was Davis told that the refinancing plan would result in Davis  selling his Home to a third party.  Neither Brooks nor Burnett explained that the refinancing plan would result in Davis' complete loss of the title to the Home.

30.   Had Davis understood that the refinancing plan Brooks, Burnett and Elite promised to arrange would result in the complete loss of title to the Home, Davis would never have authorized the transaction.

**C.**    **The Closing at Premier Title and the Role of the Attorney Westerfield and the Investor, Rowell.**

31.   At 12:00 noon on April 30, 2004, Davis met with Brooks at Elite's office located at 6058 W. North Avenue, Chicago, Illinois 60639. Brooks had scheduled the meeting to be a closing in

7

order to procure Davis' signature on various documents that were never explained to Davis.

32.    Davis waited at Elite's office until approximately 1:00 pm.  At that time, Davis rode in a car to Premier's offices with Brooks, Burnett, and Rowell, to whom Davis was not introduced. Upon arriving at Premier, Davis waited in a small room until approximately 4:00 pm, when Brooks introduced Westerfield, as an attorney representing both parties to the transaction.

33.    Davis had previously communicated with and received faxed documents from Westerfield that she said were needed for the closing.  During the April 30, 2004 closing, Westerfield reaffirmed to Davis that she was representing him.

34.    Davis did not sign a retainer agreement during the closing, or at any other time, and was not informed, by Westerfield or anyone else, of Westerfield's fee or the basis or method she would use for charging a fee.

35.    During the closing, Westerfield told Davis which documents he needed to sign, where he needed to sign them and that everything was legal.  Davis believed that Westerfield was representing his best interests in giving him such advice.

36.    During the closing, Brooks told Davis that Elite had brought in Rowell as an investor because Elite could not find a lender to finance $130-140,000.  Brooks also informed Davis that the Home had been reappraised at $200,000.

37.    Upon learning of Rowell's role as a potential investor, Davis initially refused to go forward with the closing because he was confused about the changes to the refinancing arrangements that Brooks had promised.  Brooks reassured Davis that Rowell was simply a temporary investor and that although technically Rowell would purchase the Home, Davis' name would replace Rowell's name on the title after one year if Davis made the new mortgage payments.  Brooks reassured Davis that this change would permit Davis to stay in the Home, prevent foreclosure and improve Davis' credit.

38.     Westerfield and Brooks advised Davis to accept the new conditions and to sign all of the documents.  In reliance upon Westerfield's and Brook's representations, Davis then signed all of the documents presented to him for his signature, including a deed conveying legal title in the Home from Davis to Rowell. (**Exhibit 1.**)  Davis did not read the documents presented to him for his signature before signing because:

      a.      he relied upon Brook's expertise, and assumed that Brooks, as a representative of Elite, was directing him to do what was needed to be done in order to save his Home from foreclosure;

      b.      he relied upon Westerfield's assurance that the transaction was legal;

      c.      he relied upon Westerfield's representation of being his attorney and acting in his best interests; and

      d.      much of the language in the documents that he did see was too complex and obscure for him to understand by himself.

39.     Davis signed a  "Contract For Deed," which provided that Rowell would convey to Davis the Davis Home at 2737 W. Washington for a purchase price of $190,000, and that the mortgage payments would be made in equal monthly installments of $1,223.51 beginning May 1, 2005.  (**Exhibit 2.**) The "Contract for Deed" further provided that in the event the final balloon payment for the balance of the purchase price and all accrued interest and other charges were not paid on or before May 1, 2005, the seller, Rowell, would have the option "to assist the buyer with purchase or give purchaser notice of default."

40.     Davis did not understand when he signed such documents that one of the documents purported to convey full, unconditional title in the Home to Rowell.

41.     Davis believed the agreement with Elite to be a refinancing plan when he signed the closing documents on April 30, 2004, and he would never have entered into this agreement with Elite had he understood that the effect of signing such documents would be a permanent sale of the Home to another party, a loss of all equity he had accumulated in the Home, and

vulnerability to immediate eviction by the new owner.

42.    Although Davis had been assured by Brooks and Elite that the purpose of the refinancing
arrangement was to "save" the Home from foreclosure, to allow Davis to remain living in
the Home while making mortgage payments that would improve his credit, and to enable
Davis to recover full title to his Home, no document presented to Davis for his signature at
the April 30, 2004 closing gave Davis any right to remain living in his Home after the April
30, 2004 conveyance of the Home to Rowell.

43.    Upon information and belief, Elite, Brooks and/or Burnett informed Rowell of Davis'
financial situation and advised Rowell as to the price he should pay for the Davis Home.

44.    No one, including Brooks, Burnett, or anyone else from Elite, informed Davis that Rowell
was being advised as to Davis' confidential financial information.  Davis' consent was never
obtained to disclose such information.

45.    Upon information and belief, Elite, Brooks, and Burnett at no time attempted to find
refinancing options for Davis or put Davis' Home on the open market in order to obtain the
best purchase price.

46.    Upon information and belief, Rowell acted on behalf of, and/or as agent of, Elite with
respect to his purchase of the Davis Home, and had so acted in one or more other such
similar transactions with other Elite client-homeowners facing potential foreclosures. Elite
was paid fees of $4,281 from Rowell's share of the sales price (*see* **Exhibit 3,** HUD-1
Settlement Statement).  Davis was not informed, at any time prior to being advised by
independent counsel, that Rowell paid Elite fees and thus never waived any conflict of
interest arising from the fact that the broker, whose duty it was to find a buyer with the best
price, was taking payment from a prospective buyer who was seeking to pay the lowest
price.

**D.**    **Attorney Westerfield's Dual Representation at the Closing.**

47.    Before, during, and subsequent to the closing on April 30, 2004, Westerfield did not act in Davis' economic interests, but instead acted on behalf of other parties whose economic interests conflicted with those of Davis.

48.    Upon information and belief, Westerfield was hired, selected and/or approved by Elite Title in order to secure Davis' signature on the various closing documents presented to Davis at the April 30, 2004 closing meeting.

49.    Upon information and belief, Elite had on one or more previous and subsequent occasions arranged to have Westerfield act as an attorney at closings in order to obtain signatures of customers on closing documents in transactions structured similarly to the Davis transaction at issue here.

50.    Westerfield never explained to Davis the legal and economic effects of signing the documents that she directed him to sign.

51.    Westerfield did not advise Davis not to rely on the oral promises of Elite, Brooks and Burnett, which included promises of improved credit and regaining full title to the Home.

52.    Westerfield did not advise Davis that none of the documents she presented to him for his signature at the April 30, 2004 meeting at Premier Title gave Davis any legal right to remain in the Home after signing the deed conveying title to the Home to Rowell.

53.    Westerfield did not advise Davis that he had no documentary or other legal protection guaranteeing that the monthly payments required to prevent foreclosure and to reestablish his credit would be no more than the $1,100 a month amount that Elite and Brooks had previously promised.

54.    Had Westerfield advised Davis of the foregoing, including the fact that by signing the closing documents he would be subject to immediate eviction by the new owner of the Home, Davis would never have signed the documents that Westerfield directed him to sign.

55.    Westerfield did not, at any time, disclose to Davis that she had any type of financial, legal and/or business relationship with Elite, or that such relationship with Elite presented conflicts of interest with her representation of Davis, or what the potential consequences to Davis were of her dual representation of the adversary parties in the subject real estate transaction.

56.    Westerfield's ongoing financial, legal and/or business relationship with Elite before, during and after her purported representation of Davis in connection with his Home's sale to and leaseback from Rowell created a conflict of interest with respect to Westerfield's representation of Davis.

57.    Westerfield neither asked for nor obtained Davis' permission to represent him in light of her conflicts of interest as a result of her relationship with Elite.

58.    Westerfield was paid $1,500 from Davis' proceeds of the sale of his Home to Rowell, in order to compensate her for her purported work as an attorney on his behalf in regard to the closing by which Davis' home was sold to Rowell. (*see* "HUD-1 Settlement Statement," attached as **Exhibit 3.**)

59.    Davis did not agree to the deduction of any funds from the proceeds of the sale of the Home for the purpose of compensating Westerfield for any work related to that sale, and was unaware that any funds belonging to him were paid to Westerfield to compensate her for her role as Davis' attorney, until recently advised of such transaction by independent counsel.

60.    Westerfield in fact performed no legal services on behalf of Davis.

**E.**    **Davis Does Not Receive All Money Promised To Him.**

61.    Although Davis had been promised a cash payment of approximately $56,500, after signing the refinancing documents, Davis received only $18,000.  He does not know what happened to the remaining $38,500.

62.    Upon information and belief, the difference between the promised $56,500 and the $18,000 actually paid to Davis was converted by, and for the benefit of, others. Because the information regarding who received such converted funds is within the sole knowledge of Elite and its agents and is unavailable to Plaintiff without formal discovery, Plaintiff cannot without such discovery now allege the identity of the party or parties who converted such funds.

**F.**    **Davis Makes Mortgage Payments on the New Mortgage in Rowell's Name.**

63.    Starting in May 2004, Davis made mortgage payments on Rowell's mortgage of $243.55 and $979.96 respectively, for a total monthly payment of $1,223.51, which was  $123.51 higher than the maximum monthly mortgage payment of $1100.00 Brooks' promised and $223.51 higher than his prior monthly mortgage payments..  The name "Earnest Terrell Rowell" was typed on payment coupons for Rowell's mortgage.. (**Exhibit 4**). Davis made these mortgage payments in Rowell's name by using Rowell's social security number.

64.    Davis made mortgage payments on Rowell's mortgage on the basis of his understanding, from the representations of Elite and Brooks, that the payments were to be credited to the equity that had been building for many years in the Home.

65.    Davis did not understand, and no one from Elite explained, or attempted to explain, to him, either orally or in writing, that the mortgage payments he was being asked to make on

Rowell's mortgage would not be credited to the equity he had built up in the Home, but would instead be functionally deemed "rent" that he would be paying to someone in exchange for an implicit, legally unenforceable, right to stay in the Home for some unspecified period.

66.    Davis made 20 monthly payments of $1,222.51 on the Rowell mortgage.

67.    In April 2005, Davis did not regain full legal title to his home as Brooks and Elite had promised.

**G.    Davis Signs A New "Contract for Deed" And a Lease.**

68.    On May 1, 2005, Davis signed another document labeled "Contract for Deed" purporting to extend his mortgage payment obligations for another year and giving him the option to repurchase the home in May 2006. (**Exhibit 5.**) As did the April 30, 2004 "Contract For Deed," the May 1, 2005 Contract for Deed" provided that Rowell would convey to Davis the Davis Home at 2737 W. Washington for a purchase price of $190,000, and that the payments be made in equal monthly installments of $1,223.51 beginning May 1, 2005. The "Contract for Deed" further provided that, in the event the final balloon payment for the balance of the purchase price and all accrued interest and other charges were not paid on or before May 1, 2006, the seller, Rowell, would have the option "to assist the buyer with purchase or give purchaser notice of default." Thus, none of the payments Davis made on the Rowell mortgage, totaling $14,670.12, were credited toward the $190,000 contract purchase price that Davis was required to make in order to buy back his Home from Rowell.

69.    On May 1, 2005, Davis and Rowell also signed a document entitled "Chicago Residential Lease," which provided, *inter alia*, that Davis would lease from Rowell the Home at 2737 W. Washington from May 1, 2005 to May 1, 2006 for monthly rental payments of $1,223.00. (**Exhibit 6.**)  The lease further provided that the rent check would be "made out

14

to mortgage companies."

70.    Davis made the required payments on the Rowell mortgage from May 2004 through
November 2005, over one and a half years. In December 2005, Rowell notified Davis that
the insurance on the Home had lapsed, and that in addition to the regular mortgage payment,
Davis was required to pay $680.00 for six months of insurance coverage. Davis was also
required to pay approximately $1,600 in gas and electric bills. Because Davis was unable to
pay the mortgage, insurance tax, and utilities, he did not make the December 2005 mortgage
payment on time.

71.    In January 2006, the $979.00 mortgage payment on Rowell's mortgage paid to American
Servicing, the mortgagee's servicing agent, was increased to $1036.00, making the total
monthly mortgage payment $1,279.51.

72.    In January 2006, Rowell called Davis, threatening to have the locks on the Home changed
because the mortgage payment had been late and said that the late payment was negatively
affecting Rowell's credit.

73.    Because of financial hardship, Davis missed the April 2006 payment on Rowell's mortgage
and in May 2006 Rowell served Davis with a notice of his intent to file a complaint for
forcible entry and detainer.

74.    On or about May 11, 2006, Rowell purported to convey title to the home at 2737 W.
Washington Boulevard, Chicago, Illinois 60612 to Johnnie Pierre for a price of $345,000.
The purchase was financed by a mortgage loan from NovaStar Mortgage Inc., which
recorded its mortgage with the Cook County Recorder of Deeds on May 19, 2006.

75.    On February 14, 2006, Davis recorded with the Cook County Recorder of Deeds a document
titled "Notice of Equitable Mortgage," which set forth his claim to the sole legal title to his
home at 2737 W. Washington Boulevard, Chicago, Illinois 60612, including fact that the

15

April 30, 2004 deed purporting to convey said home from him to Rowell was an equitable mortgage and not a transfer of real estate to Earnest Rowell and that any taker or assignee there from, has no right, title or interest in the property. Exhibit 8.

**H.**     **Elite's Pattern of Exploiting Financially Distressed, but Equity Rich, Homeowners by Selling, Instead of Refinancing, their Homes.**

76.     Elite and its agents Brooks and Burnett have on repeated occasions arranged transactions that were advertised as helping homeowners save their homes from foreclosure, and which included the following elements:

   a.     The purported sale of the homeowner's home to a third party recruited or employed by Elite;

   b.     The new third party owner takes a mortgage on the house, pursuant to which the mortgage lender pays off the original homeowner's mortgage and provides additional payments to the original homeowner, which payments, if made at all, are substantially less than the homeowner's equity in the Home;

   c.     The loss of the equity that the original homeowner had accumulated in the home, and

   d.     A promise that if the original homeowner made regular payments, in the nature of rent to the new owner or the new owner's mortgage lender, the homeowner would be able to regain full title to the house.

77.     Upon information and belief, rarely, if ever, have the homeowners for whom Elite has arranged such transactions for the sale of their homes, in order to help them out of foreclosure, as described in paragraph 72 above, been able to regain title to their homes.

78.     In most, if not all, of the transactions arranged by Elite, Brooks, and/or Burnett described in paragraph 72 above, the terms by which the homeowners are given the opportunity to recover title to their homes, by making payments in the nature of rent for a fixed period of time, are so onerous to the homeowner that Elite, as an expert in mortgage financing and brokering, and Brooks and Burnett as its experienced agents, knew or should have known that the homeowners who have agreed to such transactions could not reasonably be expected

16

to recover title to their homes. In one or more of the transactions described in paragraph 72 above, Elite did not sign a written contract that would even in theory offer the homeowner the conditional right to repurchase his home.

79.    In arranging the transactions described in paragraph 72 above, Elite, Brooks, and Burnett have knowingly and intentionally structured the transactions in such a way that the new legal and/or beneficial purchaser of the original homeowner's home recovers a substantial portion of the original homeowner's equity after that homeowner can no longer meet the onerous monthly rent payments.

80.    In most, if not all, of the transactions arranged by Elite, Brooks, and/or Burnett described in paragraph 72 above, the new legal and/or beneficial purchaser of the original homeowner's home has in fact recovered a substantial portion of the original homeowner's equity.

81.    There is no reasonable economic justification for the original homeowners to have entered the transactions arranged by Elite, Brooks, and/or Burnett and as described in paragraph 72 above, where the new legal and/or beneficial purchaser of the original homeowner's home has recovered a substantial portion of the original homeowner's equity.

82.    The original homeowners who entered the transactions, as arranged by Elite, Brooks, and/or Burnett, as described in paragraph 72 above, where the new legal and/or beneficial purchaser of the original homeowner's home has recovered a substantial portion of the original homeowner's equity, agreed to those transactions because they were under economic duress as a result of the fear of losing their homes to foreclosure, and because they did not understand the legal and economic consequences of the transactions, which made highly likely the loss of equity in, and title to their homes.

I.    **Defendants use the same scheme they used to defraud Davis out of title to his home to defraud the Earls' family out of title to their home.**

83.    In March and April, 2004, Defendants Elite, Brooks and Burnett used fraudulent representations, misrepresentations and knowing omissions of material fact as part of a scheme to defraud Irving and Portia Earls out of title to their home in the following ways:

a.    Knowingly and intentionally failing to disclose to Irving and Portia Earls that by signing a stack of documents presented to them at an April 28, 2004 closing they were giving up complete legal title to their home as well as the right under Illinois law and their existing mortgage agreement to recover the equity they had accumulated in their home and affirmatively misleading Irving and Portia Earls into believing that they were not giving up complete legal title to their home and the equity they had accumulated in the home;

b.    Knowingly and intentionally representing to Irving and Portia Earls that if they made regular monthly payments on a new mortgage, they would have a right to regain full and clear title to their home when in fact after conveying their home at the closing to Rowell, they had no legal right to regain title to the Home under any circumstances, regardless of whether they made all of the payments on the new mortgage;

c.    Knowingly and intentionally representing to Irving and Portia Earls that if they made regular monthly payments on the new mortgage, they would be adding to the equity in their home;

d.    Knowingly and intentionally representing to Irving and Portia Earls that their monthly payments under the refinancing agreement they promised would be in the amount of $1,200.00 when in fact they knew said payments would be in the amount of $1,635.52;

e.    Knowingly and intentionally representing to Irving and Portia Earls that, under the refinancing agreement arranged by Defendants, Irving and Portia Earls would be paid substantially more than the $18,000 they were paid after the closing at Elite's office;

f.    Knowingly and intentionally representing to Irving and Portia Earls that Elite and Brooks would be using their expertise in the real estate finance profession to serve the financial interests of Irving and Portia Earls when in fact they knew they would be putting their own interests ahead of the Earls and acting directly contrary to the Earls' financial interests; and

18

g.      Arranging for an attorney to purportedly represent Irving and Portia Earls' interests in the sale of their Home while knowing that such attorney would not in fact do so, but would further their own and other third party interests.

## LEGAL CLAIMS

## COUNT I

## RICO CLAIM UNDER 18 U.S.C. § 1962(c) AGAINST MELVIN BROOKS AND ANDRE BURNETT

84.     Davis alleges and incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

85.     Elite is an enterprise engaged in activities which affect, interstate commerce.

86.     Brooks and Burnett were, at all relevant times hereunder, employees of and associated with Elite.

87.     Brooks and Burnett knowingly and willfully participated directly and indirectly in the conduct of the affairs of Elite, through a pattern of racketeering activities, including, but not limited to, wire fraud and mail fraud.

88.     Brooks and Burnett intentionally and willfully engaged in, and directed employees of Elite to engage in, conduct in violation of 18 USC § 1341 (mail fraud) and 18 USC 1343 (wire fraud). Such conduct included, among other things:

a.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly and intentionally failed to disclose to Davis that by signing the stack of documents presented to him at the April 30, 2004 closing, he was giving up complete legal title to his home as well as the right under Illinois law and his existing mortgage agreement to recover the equity he had accumulated in the Home;

b.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they affirmatively misled Davis into believing that by signing the documents presented to him at the closing he was not giving up complete legal title to his home and to the equity he had accumulated in the home;

c.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and

falsely told Davis that if he made regular monthly payments on Rowell's mortgages for one year, he would have a right to regain full and clear title to the Home;

d.  In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that his monthly payments under the refinancing agreement would be less than the amount of $1,100.00 when in fact Defendants knew said payments would initially be in the amount of $1,222.51;

e.  In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that, under the refinancing agreement arranged by Defendants, Davis would be paid substantially more than the $18,000 he was paid after the closing at Premier Title;

f.  In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that Elite and Brooks would use their expertise in the real estate finance profession to serve the financial interests of Davis when in fact they knew they would be putting their own interests ahead of Davis and acting directly contrary to Davis' financial interests; and

g.  In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly and intentionally arranged for an attorney to purportedly represent Davis' interests in the sale of his Home while knowing that such attorney would not in fact do so, but would further their own and other third party interests.

89.  Brooks and Burnett committed more than two Predicate Offenses, within 10 years of each other, as part of a common scheme to defraud Davis and other similarly situated homeowners for their own personal benefit. In addition to the wire and mail fraud perpetrated against Davis alleged in ¶ 86 above, Brooks and Burnett used the same scheme of wire fraud and mail fraud to defraud the Earls as alleged in ¶ 86 above.

90.  Brooks' and Burnett's use of numerous telephonic communications with Davis were incident to essential parts of their scheme to defraud Davis. These telephonic communications included:

a.  Davis' initial call to Elite and Brooks in approximately the middle of March 2004 by which call Brooks falsely assured Davis that he and Elite would find refinancing for him that would save Davis' home from

foreclosure.

b. Brooks' and Burnett's calls to Davis in mid-March 2004, several days after Davis' initial call to Elite, which calls they made for the purpose of setting up Brooks' and Burnett's meetings at Davis' Home, at which meetings Brooks and Burnett elaborated on their false promises to find refinancing for Davis' Home and convinced Davis to agree to their financing plans.

c. numerous calls between Davis and Brooks and Burnett in April 2004 after Davis had agreed to go ahead with the promised refinancing by which calls Brooks and Burnett repeatedly and falsely assured Davis that progress was being made on their refinancing plan and that Davis had no need of his own attorney.

d. Brooks' and Burnet's call to Davis shortly before the April 28, 2004 closing for the purpose of scheduling the closing, at which Brooks and Burnett consummated their fraudulent scheme to take title to the Home and deprive Davis of his equity in the Home.

91. The use of the United States Mail was incident to an essential part of Brooks' and Burnet's scheme to defraud Davis in that all of the coupons for the payments on Rowell's mortgage on the Home were sent to Davis through the United States Mail and all of Davis' payments on the Rowell mortgage were made through the United States mail, including monthly payments on the Rowell mortgage in the amounts of $243.51 and $979.00 respectively between May 2004 and April 2005.   Without access to mortgage lenders from throughout the United States, who conduct their payment transactions with their borrowers through the United States Mail, Brooks and Burnet could not have gained access to the funding that made their fraudulent real estate financing schemes possible.

92. Brooks' and Burnett's activities are in violation of 18 U.S.C. § 1962(c).

93. As a result of Brooks' and Burnett's racketeering activities, Davis has been significantly damaged.

WHEREFORE, Davis respectfully requests that this Court:

a.    Enter a judgment in favor of Davis and against Brooks and Burnett as to Davis's damages;

b.    Award Davis treble damages as a result of Brooks and Burnett's violations of 18 U.S.C. § 1962(c);

c.    Enter a judgment in favor of Davis and against Brooks and Burnett as to Davis's costs and attorneys' fees incurred in bringing this Claim; and

d.    Grant Davis such other and further relief as this Court deems equitable and proper.

## COUNT II

## RICO CLAIM UNDER 18 U.S.C. § 1962(d) AGAINST BROOKS AND BURNETT

94.   Davis alleges and incorporates by reference paragraphs 1 through 93 as though fully set forth herein.

95.   Elite is an enterprise engaged in activities which affect interstate commerce.

96.   Brooks and Burnett were at all relevant times hereunder employees of Elite.

97.   On information and belief, Brooks and Burnett came to a mutual understanding to conduct the affairs of Elite through a pattern of racketeering activities, including, but not limited to, wire fraud and mail fraud.

98.   Brooks and Burnett knowingly and willfully became a member of the conspiracy by objectively indicating, through their words and actions, their agreement to participate, directly and indirectly, in the conduct of the affairs of Elite through a pattern of racketeering activities, including, but not limited to, wire fraud and mail fraud.

99.   Both Brooks and Burnett committed overt acts, both in telephone conferences and through the use of the mail, during their conspiracy, in order to induce Davis to enter into their fraudulent sale-leaseback financing scheme.

100.  Brooks' and Burnet's use of numerous telephonic communications with Davis were incident to essential parts of their scheme to defraud Davis. These telephonic communications included:

a.     Davis' initial call to Elite and Brooks in approximately the middle of March, 2004 by which call Brooks falsely assured Davis that he and Elite would find refinancing for him that would save Davis' home from foreclosure.

b.     Brooks' and Burnett's calls to Davis in mid-March, 2004, several days after Davis' initial call to Elite, which calls they made for the purpose of setting up Brooks' and Burnett's meetings at Davis' Home, at which meetings Brooks and Burnett elaborated on their false promises to find refinancing for Davis' Home and convinced Davis to agree to their financing plans.

c.     numerous calls between Davis and Brooks and Burnett in April, 2004 after Davis had agreed to go ahead with the promised refinancing by which calls Brooks and Burnett repeatedly and falsely assured Davis that progress was being made on their refinancing plan and that Davis had no need of his own attorney.

d.     Brooks' and Burnet's call to Davis shortly before the April 28, 2004 closing for the purpose of scheduling the closing, at which Brooks and Burnett consummated their fraudulent scheme to take title to the Home and deprive Davis of his equity in the Home.

101.    The use of the United States Mail was incident to essential part of Brooks' and Burnett's scheme to defraud Davis in that all of the coupons for the payments on Rowell's mortgage on the Home were sent to Davis through the United States Mail and all of Davis' payments on the Rowell mortgage were made through the United States mail, including monthly payments on the Rowell mortgage to the mortgage servicers and lenders in the amounts of $243.51 and $979.00 respectively between May 2004 and April 2005.   Without access to mortgage lenders from throughout the United States, who conduct their payment transactions with their borrowers through the United States Mail, Brooks and Burnett could not have gained access to the funding that made their fraudulent real estate financing schemes possible.

102.    Brooks and Burnett intentionally and willfully engaged in, as part of the conspiracy, conduct in violation of 18 USC § 1341 (mail fraud) and 18 USC 1343 (wire fraud). Such conduct included, among other things:

a.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly and intentionally failed to disclose to Davis that by signing the stack of documents presented to him at the April 30, 2004 closing, he was giving up complete legal title to his home as well as the right under Illinois law and his existing mortgage agreement to recover the equity he had accumulated in the Home;

b.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they affirmatively misled Davis into believing that by signing the documents presented to him at the closing he was not giving up complete legal title to his Home and to the equity he had accumulated in the Home;

c.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that if he made regular monthly payments on the new mortgage for one year, he would have a right to regain full and clear title to the Home;

d.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that his monthly payments under the refinancing agreement would be less than the amount of $1,100.00 when in fact Defendants knew said payments would initially be in the amount of $1,222.51;

e.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that, under the refinancing agreement arranged by Defendants, Davis would be paid substantially more than the $18,000 he was paid after the closing at Premier Title;

f.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly, intentionally and falsely told Davis that Elite and Brooks would use their expertise in the real estate finance profession to serve the financial interests of Davis when in fact they knew they would be putting their own interests ahead of Davis and acting directly contrary to Davis' financial interests;

g.      In violation of their fiduciary duties of full and honest disclosure and of not profiting at the expense of their client, they knowingly and intentionally arranged for an attorney to purportedly represent Davis' interests in the sale of his Home while knowing that such attorney would not in fact do so, but would further their own and other third party interests; and

h.      Brooks and Burnett intentionally and willfully engaged in, and directed employees of Elite to engage in, fraudulent conduct, including, among other things, misleading Davis into believing that they were arranging refinancing for his Home, misleading Davis into believing that the monthly payments he

would have to make in order to "save" his Home were substantially less than they required of him at the closing, misleading Davis into believing that they were acting in his best financial interests when in fact they were acting against those interests.

103.   Brooks and Burnett committed more than two Predicate Offenses, within 10 years of each other, as part of a common scheme to defraud Davis for their own personal benefit. In addition to the wire and mail fraud perpetrated against Davis alleged in ¶ 97 above, Brooks and Burnett used the same scheme of wire fraud and mail fraud to defraud the Earls as alleged above.

104.   Brooks and Burnett's activities are a violation of 18 U.S.C. § 1962(d).

105.   As a result of Brooks and Burnett's racketeering activities, Davis has been significantly damaged.

WHEREFORE, Davis respectfully requests that this Court:

   a.   Enter a judgment in favor of Davis and against Brooks and Burnett as to Davis's damages;

   b.   Award Davis treble damages as a result of Brooks and Burnett's violations of 18 U.S.C. § 1962(d);

   c.   Enter a judgment in favor of Davis and against Brooks and Burnett as to Davis's costs and attorneys' fees incurred in bringing this Claim; and

   d.   Grant Davis such other and further relief as this Court deems equitable and proper.

## COUNT III

## DECLARATORY JUDGMENT – EQUITABLE MORTGAGE CLAIM AGAINST ROWELL, DECISION ONE, MERS, PIERRE, NOVASTAR, AND UNKNOWN OWNERS

106.   Plaintiff hereby alleges and incorporates by reference paragraphs 1 through 105 as though fully set forth herein.

107.   The Warranty Deed recorded with the Cook County Recorder of Deeds as Document Number 0413111022, (**Exhibit 1**), and other closing documents, although purporting to

convey the Home from Davis to Rowell, should properly be construed as an equitable mortgage because, pursuant to 735 ILCS 5/15-1207(c) and (e), they were "intended only as a security in the nature of a mortgage."

108.   The deed transfer from Rowell to Pierre purporting to convey title to the Home at 2737 W. Washington Boulevard, Chicago, Illinois 60612, though formally a conveyance of real property, should also be construed as creating an equitable mortgage. Notice of equitable mortgage was properly filed on February 14, 2006 with the Cook County Recorder of Deeds prior to Pierre's purchase of the Home on or about May 11, 2006 and prior to the recording of NovaStar's mortgage on May 19, 2006. Therefore, because neither Pierre nor NovaStar can be considered bona fide purchasers of the Home from Rowell, neither Pierre nor NovaStar can take an interest in the Home greater than that which Rowell possessed, which was that of an equitable mortgagee.

109.   The following facts require the finding that the formal conveyance of the Home by Davis to Rowell should be deemed an equitable mortgage as a matter of law:

   a.   The economic benefit received by Davis from the conveyance of the Home to Rowell was grossly disproportionate to Davis' equity in that Home. Although Davis had approximately $50,000 in equity in his Home at the time of the closing, he received only $18,000 from the proceeds;

   b.   In order to be able remain in his Home pursuant to his lease agreement with Rowell, Davis must make monthly payments of $1,279.51, none of which contributes to Davis' equity in his Home;

   c.   At all relevant times, Davis believed the monthly payments to be mortgage payments resulting from a refinancing of his Home;

   d.   Elite, Brooks, and Burnett, who arranged and participated in the sale of the Home, were sophisticated professionals in the field of real estate sales and financing, while Davis had minimal formal education, no experience in, or understanding of, the  complexities of real estate financing and sales which were the subject of the transactions at issue here, and was suffering from poor health at the time of the transaction;

e.      Davis was not adequately represented or advised by counsel other than the attorney at the closing who was provided for him at the behest of Elite, and who, in fact, worked against Davis' interests as a result of her conflicts of interest;

f.      Davis remained in the Home after the purported sale and exercised various other indicia of ownership, including paying the monthly payments on the mortgage issued to Rowell and making utility, insurance and tax payments;

g.      Davis was promised an option to "repurchase" and obtain unconditional title to the Home, which was in fact in the nature of the repayment of a debt; and

h.      Davis, as well as Rowell, following the purported conveyance of the Home to Rowell, continued to act in the belief that Davis' debt on the mortgage loan taken out on the Home remains unpaid and that Davis continued to make payments on Rowell's mortgage on the Home.

110.    Consideration of each of the above factors warrants the court to construe the deed transfer from Davis to Rowell as the granting of an equitable mortgage, thereby voiding the deed transfer.

WHEREFORE Plaintiff respectfully requests that this Court:

a.      Declare that the Warranty Deed recorded as Document Number 0413111022 was a mortgage on Davis' interest in the subject property;

b.      Declare that Davis is entitled to all the rights and remedies accorded to mortgagees under state and federal law, including, but not limited to that title to the Home is held by Davis;

c.      Invalidate the title interests of Pierre, NovaStar, and any Prior or Unknown Owners whose purported interest depends upon the validity of said Warranty Deed transfer;

d.      Award Davis the costs of bringing this action herein; and

e.      Grant Davis such other and further relief as it deems equitable and proper.

## COUNT IV

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT CLAIM AGAINST DEFENDANTS ELITE, BROOKS AND BURNETT

111.    Davis alleges and incorporates by reference paragraphs 1 through 110 as though fully set forth herein.

112.    Davis is a "person" and "consumer" as defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c) and 505/1(e).

113.    At all times relevant to this case, Elite, Brooks and Burnett were engaged in commerce and trade in Illinois.

114.    Elite, Brooks and Burnett employed deceptive acts and practices and made fraudulent misrepresentations, misstatements and omissions of material fact with the intent that Davis rely upon such acts, practices, representations, misstatements and omissions of material fact.

115.    Said deceptive acts and practices, fraudulent misrepresentations, misstatements and omissions of material fact include, but are not limited to, the following:

    a.    Failing to disclose to Davis that, by executing the documents presented to him at the April 30, 2004 closing, he was relinquishing (i) legal title to the Home and (ii) most of the equity he had accumulated in the Home;

    b.    Affirmatively misleading Davis into signing documents under the mistaken belief that he was not relinquishing legal title to, and equity in, his Home;

    c.    Misleading Davis into believing that he was refinancing his Home, when in fact he was conveying title to Rowell and agreeing to lease the Home;

    d.    Misleading Davis as to Elite's intent and/or ability to refinance Davis' existing mortgage with Ameriquest;

    e.    Affirmatively misleading Davis into believing that his monthly payments were mortgage payments, when in fact they were rent payments;

    f.    Affirmatively misleading Davis into believing that if he made regular monthly payments on Rowell's mortgage for one year, he would have a right to regain full and clear title to the Home;

g.      Misleading Davis into signing documents under the mistaken belief that by making the payments on the Rowell's Servicing mortgage, he was adding to the equity in the Home;

h.      Misleading Davis into signing documents under the mistaken belief that his monthly payments under the refinancing agreement would not exceed $1,100.00 when in fact the payments due and owing began at $1,222.51 and escalated thereafter;

i.      Misleading Davis into signing documents under the mistaken belief that under the refinancing agreement he would be paid substantially more than the $18,000 he was paid after the closing;

j.      Converting to Elite's use, or that of Elite's agents, Brooks, and/or Burnett, $38,506.72 in equity that represents the difference between the $143,493.28 paid to Ameriquest to discharge Davis' previous mortgage and the $18,000 paid to Davis at the closing, from the $200,000 mortgage loan borrowed through the Wilshire and America Serving on Davis' home;

k.      Misleading Davis into paying an attorney for purportedly rendering services to him, while having full knowledge that the attorney was actually working on behalf of Elite, Brooks, Burnett, and Rowell, and not on Davis' behalf;

l.      Misleading Davis into signing documents under the mistaken belief that Elite, Brooks and Burnett were using their expertise in the real estate finance profession to serve his best interests, when in fact they were intentionally putting their own interests first and acting directly contrary to Davis' financial interests; and

m.      Misleading Davis by advertising to him, as well as to the general public, that they would arrange transactions to "save" the homes of people facing foreclosure when in fact they arranged transactions that assured the opposite of their promotion, *i.e.*, the loss of the home as well as the loss of the equity the homeowner has built up in the home.

116.   In addition to violating the Illinois Consumer Fraud and Deceptive Business Practices Act through the foregoing misrepresentations, misstatements and omissions of material fact, Defendants Elite, Brooks and Burnett also violated the Act through engaging in the following unfair practices that were objectively unreasonable for any consumer to willingly and knowingly agree to:

      a.       Arranging a refinancing transaction to prevent foreclosure of Davis' Home, the result of which was to divest Davis of both legal title and the equity in his Home without a counterbalancing benefit;

      b.       Arranging a refinancing transaction purportedly to prevent foreclosure of Davis Home, but which caused Davis to make monthly payments on a mortgage loan that was credited to the third party buyer-mortgagor instead of toward increasing Davis' equity in the Home.

117.    The acts and practices, fraudulent misrepresentations, misstatements and omissions of material fact, alleged in ¶¶ 111 and 112 above, were deceptive, violative of generally recognized standards of business and unfair in that they offend public policy, are immoral, unethical, oppressive, and unscrupulous and cause substantial injury to consumers.

118.    Elite, Brooks and Burnett engaged in these unfair acts, practices, misrepresentations, misstatements, and omissions with the intent that Davis rely upon them to his detriment.

119.    As a direct and proximate cause of Defendants Elite's, Brooks' and Burnett's foregoing actions, Davis has suffered substantial economic harm, including but not limited to, the loss of title to the Home, the loss of equity in the Home, the loss of the contribution to his equity in the Home of the monthly mortgage payments made since May 1, 2004 and the imminent prospect of being evicted from his Home.

WHEREFORE, Davis respectfully requests that this Court:

      a.       Award actual and punitive damages in an amount to be determined at trial;

      b.       Award recoverable costs and attorneys' fees; and

      c.       Award such other relief as is equitable and proper.

## COUNT V

## COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT CLAIM AGAINST ELITE, BROOKS AND BURNETT

120.    Davis alleges and incorporates by reference paragraphs 1 through 119 as though fully set forth herein.

121.    Elite, Brooks and Burnett knowingly and intentionally made fraudulent representations and misrepresentations and omissions of material fact in order to induce Davis to enter into the subject transaction.  Elite's, Brooks' and Burnett's misrepresentations of fact and deliberate omissions of fact amount to a scheme to defraud Davis in that such misrepresentations and omissions were made by Elite, Brooks and Burnett on multiple occasions both to Davis and to other victims of other similar transactions, and were made in violation of their fiduciary duty of disclosure as both real estate and mortgage brokers and as agents of Davis.

122.    Elite, Brooks and Burnett pursued a scheme to defraud Davis which include the following fraudulent representations and misrepresentations and omissions of material fact:

a.    Elite, Brooks and Burnett knowingly and intentionally failed to disclose to Davis that by signing the documents presented to him at the April 30, 2004 closing, he was relinquishing (i) legal title to the Home, and (ii) most of the equity he had  accumulated in the Home;

b.    Affirmatively misleading Davis into signing documents under the mistaken belief that he was not relinquishing legal title to, and equity in, his Home;

c.    Misleading Davis into believing that he was refinancing his Home, when in fact he was conveying fee title to Rowell and agreeing to lease the Home;

d.    Misleading Davis as to Elite's intent and/or ability to refinance Davis' existing mortgage with Ameriquest;

e.    Affirmatively misleading Davis into believing that his monthly payments were mortgage payments, when in fact they were rent payments;

f.    Affirmatively misleading Davis into believing that if he made regular monthly payments on Rowell's mortgage for one year, he would have a right to regain full and clear title to the Home;

g.    Misleading Davis into signing documents under the mistaken belief that by making the payments on Rowell's mortgage, he was adding to the equity in the Home;

h.    Misleading Davis into signing documents under the mistaken belief that his monthly payments under the refinancing agreement would not exceed $1,100.00 when in fact the payments due and owing began as $1,222.51 and escalated thereafter;

i.   Misleading Davis into signing documents under the mistaken belief that under the refinancing agreement he would be paid substantially more than the $18,000 he was paid after the closing;

j.   Converting to Elite's use, or that of Elite's agents, Brooks and/or Burnett, $38,506.72 in equity that represents the difference between the $143,493.28 paid to Ameriquest to discharge Davis' previous mortgage and the $18,000 paid to Davis at the closing, from the $200,000 mortgage loan borrowed through the Wilshire and America Serving on Davis' home;

k.   Misleading Davis into paying an attorney for purportedly rendering services to him, while having full knowledge that the attorney was actually working on behalf of Elite, Brooks, Burnett, and Rowell, and not Davis;

l.   Misleading Davis into signing documents under the mistaken belief that Elite, Brooks and Burnett were using their expertise in the real estate finance profession to serve his best interests, when in fact they were intentionally putting their own interests first and acting directly contrary to Davis' financial interests; and

m.   Misleading Davis by advertising to him, as well as to the general public, that they would arrange transactions to "save" the homes of people facing foreclosure when in fact they arranged transactions that assured the opposite of their promotion, *i.e.*, the loss of the home as well as the loss of the equity the homeowner has built up in the home.

123.   Elite, Brooks and Burnett intended that Davis rely on the foregoing representations and omissions in executing the subject loan transaction and Davis in fact did rely on those representations and omissions in executing the various documents in connection with the purported sale of his Home.

124.   As a direct and proximate cause of Defendants' actions, Davis has suffered substantial economic harm, including but not limited to, the loss of title to the Home, the loss of equity in the Home, the loss of the contribution to the Home equity of the monthly mortgage payments made since May 1, 2004, and the imminent prospect of being evicted from the Home.

WHEREFORE, Davis respectfully requests that this Court:

a.   Award actual and punitive damages in an amount to be determined at trial;

      b.      Award recoverable costs and attorneys' fees; and

      c.      Award such other relief as is equitable and just.

<u>**COUNT VI**</u>

<u>**UNCONSCIONABILITY CLAIM AGAINST DEFENDANTS ELITE, BROOKS,
BURNETT, ROWELL, AND DECISION ONE MORTGAGE COMPANY**</u>

125.    Davis alleges and incorporates by reference paragraphs 1 through120 as though fully set forth herein.

126.    Throughout the course of the subject transaction, an enormous disparity in bargaining power existed between Davis and Defendants Elite, Brooks, Burnett, Rowell, and Decision One. Davis is a homeowner who was facing desperate financial circumstances and the loss of his Home.  In contrast, the Defendants who arranged and participated in the sale of Davis' Home are experienced business entities and individuals who sought to profit from the disparity in bargaining power, and who did so by deliberately targeting Davis with misinformation after gaining his confidence in their business acumen and dedication to his best interests.

127.    The disparity in bargaining power in this case was aggravated by the fact of Davis' relative lack of formal education, poor health, almost complete lack of business or financial experience, and Defendants' implementation of schemes to exploit the financial vulnerability of elderly homeowners in low income and minority neighborhoods in Cook County, Illinois.

128.    The terms of the subject transaction are so one-sided as to be abusive and unconscionable. Defendants exploited the disparity in bargaining power to induce Davis to transfer title to his Home and make payments on a third party's mortgage loan despite the fact that Davis would

never receive equity as a result of those payments nor any legal right to continue to live in the Home.

129.    The documents that Defendants presented to Davis, which Defendants required Davis to sign in order to do what Defendants said was necessary to save Davis' home from foreclosure, were standardized forms that were submitted to Davis for acceptance without meaningful opportunity to negotiate terms.

130.    The transactions arranged by Defendants by which Davis conveyed the Home to Rowell and gave up the equity in the Home in exchange for substantially less in consideration, were so unfavorable to Davis and favorable to Defendants that no reasonable homeowner would ever agree to such transaction and no honest person would accept the benefits of such transaction.

131.    Said procedural and substantive unconscionability renders void and unenforceable the April 30, 2004 transfer of title as well as all subsequent transfers that followed from the April 30, 2004 title transfer.

WHEREFORE, Davis respectfully requests that this Court:

    a.    Enter judgment in his favor and against Defendants;

    b.    Award actual damages;

    c.    Void the transfer of title;

    d.    Find that the purported sale of his home was unconscionable; and

    e.    Grant such other or further relief as the Court deems equitable and proper.

## COUNT VII

## BREACH OF FIDUCIARY DUTY CLAIM AGAINST ELITE, BURNETT AND BROOKS FOR THEIR ROLE AS MORTGAGE BROKERS

132.    Davis alleges and incorporates by reference paragraphs 1 through 131 as though fully set forth herein.

133. Defendants are individuals or entities regularly engaged in and knowledgeable of the interrelated businesses of real estate investment, mortgage lending, and mortgage foreclosure.

134. Conversely, Davis is an unsophisticated consumer with little understanding of the businesses of real estate investment, mortgage lending, or mortgage foreclosure.

135. Defendants selected Davis for its "rescue fraud" scheme because they knew that Davis was an unsophisticated homeowner facing a desperate financial situation and because he lived in a low income, and minority community that has comparatively little access to the mainstream home financing resources that are prevalent in wealthier, non-minority communities.

136. In light of the disparity in the parties' commercial background and experience, the trust and confidence Davis placed in Elite, Brooks and Burnett as a result of their representations of both their expertise and their ability to help save Davis' Home, and Defendants' exploitation of Davis' economic duress, Defendants Elite, Brooks and Burnett owed Davis a fiduciary duty as a matter of fact.

137. Further, Defendants represented themselves to the public in general, and to Davis in particular, as mortgage brokers and acted in that capacity in their dealing with Davis.

138. In addition, Defendants Elite, Brooks and Burnett represented themselves to the public in general, and to Davis in particular, as working to find financing for their clients that would be in their clients' best financial interests.

139. Mortgage brokers, such as Defendants here, as a matter of law in Illinois owe their clients, such as Davis, fiduciary duties.

140. By virtue of their deceptive acts and practices, misrepresentations, and misstatements and omissions of fact, their conflicts of interest and failure to disclose such conflicts, and their

failure to serve and try to serve the financial best interests of Davis, all as set forth above in

¶¶ 111, 112 and 118, Defendants breached their fiduciary duty to Davis.

141.    As a direct and proximate cause of Defendants' actions, Davis has suffered substantial harm,

including but not limited to, the loss of title to the Home, the loss of equity in the Home, the

loss of the contribution to the Home equity of the monthly mortgage payments made since

May 1, 2004, and the imminent prospect of being evicted from his Home.

WHEREFORE, Davis respectfully requests this Court to:

a.      Award actual and punitive damages in an amount to be determined at trial;

b.      Award recoverable costs and attorney's fees; and

c.      Award such other relief as is equitable and just.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY CLAIM AGAINST ELITE, BURNETT AND BROOKS FOR THEIR ROLE AS REAL ESTATE BROKERS

142.    Davis alleges and incorporates by reference paragraphs 1 through 141 as though fully set

forth herein.

143.    To the extent Elite, Brooks, and Burnett were acting in their dealings with Davis as real

estate brokers, they owed him, as a matter of Illinois law, a fiduciary duty to try to find for

him the best price for his Home that was reasonably available.

144.    In addition, to the extent Elite, Brooks and Burnett were acting in their dealings with Davis

as real estate brokers, they also owed him, as a matter of Illinois law, both a fiduciary duty

to disclose all conflicts of interest, including the disclosure of all interests in transactions

from which they could benefit at his expense, and a fiduciary duty not to reveal confidential

information learned from Davis in ways that could advantage potential buyers of Davis'

Home.

145.    Elite, Brooks and Burnett developed a fiduciary relationship with Davis as real estate brokers as a matter of fact and as a matter of law as a result of: the disparity between their understanding of and experience in real estate finance and matters of commerce generally; the trust and confidence Davis placed in Elite, Brooks and Burnett; Brooks' representations of his expertise and ability to help save Davis's Home ;and, Brooks' exploitation of Davis's economic duress.

146.    In their work for Davis as real estate brokers, Elite, Brooks and Burnett violated their fiduciary duties in the following ways:

    a.    they failed to try to find for Davis the best reasonably available price for his Home;

    b.    they engaged Davis in a transaction for the sale of his Home in which they had a conflict of interest in that they also had either an ongoing fiduciary or ongoing business relationship with Rowell;

    c.    they failed to disclose to Davis their conflict of interest with him by virtue of their ongoing fiduciary or ongoing business relationship with Rowell; and

    d.    they revealed without Davis' permission and to Davis' detriment confidential information learned from Davis as a result of their fiduciary relationship with Davis.

147.    In addition to their breaches of fiduciary duty alleged in paragraph X above, Elite, Brooks and Burnett violated their fiduciary duty to Davis by virtue of their deceptive acts and practices, misrepresentations, and misstatements and omissions of fact, as set forth above.

148.    As a direct and proximate cause of these Defendants' actions, Davis has suffered substantial harm including but not limited to the loss of title to the Home, the loss of equity in the Home, the loss of the contribution to the Home equity of the monthly mortgage payments made since May 1, 2004, and the imminent prospect of being evicted from his Home.

WHEREFORE, Davis respectfully requests that this Court:

    a.    Award actual damages in an amount to be determined at trial;

b.       Award recoverable costs and attorney's fees; and

c.       Award such other relief as is equitable and just.

## COUNT IX

## CLAIM FOR PROFESSIONAL MALPRACTICE AGAINST WESTERFIELD

149.    Davis alleges and incorporates by reference paragraphs 1 through 148 as though fully set

forth herein.

150.    Westerfield had a duty to represent Davis competently, professionally, with the reasonable

degree of care and skill of an attorney representing a client for a real estate closing and

without any undisclosed and unconsented to conflicts of interests.

151.    Westerfield's general duty of competent, professional, loyal and unconflicted representation

included the following specific duties with respect to Davis:

a.       the duty to explain to Davis all matters of fact and law that would be
reasonably necessary to enable him to make informed decisions regarding the
matters on which she is representing him;

b.       the duty to personally consult with Davis in order to determine the goals of
her representation of him;

c.       the duty to advise Davis of the available options for alternative legal
solutions and to explain to him the foreseeable risks and benefits of each;

d.       the duty not to charge Davis excessive fees;

e.       the duty to inform Davis of all actual and potential conflicts of interest,
including all relationships that might give the appearance of conflict of
interest;

f.       the duty to obtain Davis' informed consent in order to continue to represent
him in  spite of her actual and potential conflicts of interest; and;

g.       the duty to inform Davis of the basis for determining Westerfield's
compensation and to obtain his prior consent to all fee payments made to her
on his behalf, unless pursuant to court order.

152.  At the closing at Elite's office on April 30, 2004, Westerfield appeared at the behest of Elite to further its interests in consummating the conveyance of Davis' Home to Rowell.

153.  At said closing, Westerfield did not advise Davis that she was not acting exclusively as his attorney nor exclusively on his behalf.

154.  Westerfield also did not advise Davis that he was in need of legal advice from an attorney who would represent his interests exclusively.

155.  Westerfield also did not advise Davis of her own interests in doing what Elite and its agents wanted her to do with respect to Davis' transaction.

156.  Because Westerfield was being paid by Davis for her services at the closing and because she purported to be his attorney at the closing, Davis had the legal right to direct and control Westerfield's conduct in connection with the closing.

157.  Westerfield was not in fact acting as Davis's attorney nor in Davis' financial best interests, but, to the contrary, was acting against Davis's financial best interests and in the interest of Elite and its agents and other beneficiaries from the Davis transaction, all at Davis' expense.

158.  Westerfield violated her duty of competent, professional and loyal representation by failing to inform Davis of the matters of fact and  of law that were necessary to enable him to make an informed decision about whether or not to sign the documents he signed at the closing, including specifically that by signing said documents he would be conveying complete title to the Home, that he would thereby lose his rights to the equity he had built up in the Home and that immediately after the conveyance of title to the Home to Rowell he would be subject to immediate eviction as a result of that conveyance.

159.  Westerfield also violated her duty of competent, professional and loyal representation by failing to consult Davis about the goals of her representation of him and by, thereby, failing

to learn that a critical goal of his was to avoid having to sell the Home, and that, it was his goal to refinance it so that he could continue to live in it.

160. Westerfield also violated her duty of competent, professional and loyal representation by failing to advise Davis as to whether signing the documents at the closing would serve his goals, including, specifically, advising him that signing said documents would be contrary to his goal of not wanting to sell the Home.

161. Westerfield also violated her duty of competent, professional and loyal representation by failing to advise Davis that signing the documents at the closing would not be in his financial interests in that he would lose the substantial equity he had built up in the Home without any comparable economic benefit.

162. Westerfield also violated her duty of competent, professional and loyal representation by charging Davis $1,500 for legal services she never provided for him and, to the extent she did provide him any legal services, overcharging for the services she did provide.

163. Westerfield also violated her duty of competent, professional and loyal representation both by never obtaining, nor trying to obtain, Davis's permission to represent him with respect to the transaction for which she was paid $1,500 from the proceeds of the sale of the Home and by never obtaining his prior consent to be paid 1,500 from the proceeds of the sale of the Home.

164. Westerfield also violated her duty of competent, professional and loyal representation by failing to disclose to him that she had an ongoing financial, legal or business relationship with Elite as well as failing to disclose to him that such relationship created a conflict of interest with respect to her duty of loyalty and that he had a legal right to refuse to waive such conflict of interest.

165. Westerfield also violated her duty of competent, professional and loyal representation by failing to ask for and failing to obtain Davis's permission to represent him in spite of her conflict of interest as a result of her relationship with Elite.

166. Had Westerfield complied with her duty of competent, professional and loyal representation as alleged above, Davis would not have signed the closing documents that he signed at the closing.

167. As a direct and proximate cause of Westerfield's actions, Davis has suffered substantial harm, including but not limited to, the loss of title to the Home, the loss of equity in the Home, the further encumbrance of the Home due to the mortgage executed by Rowell, the monthly payments made since May 2004, and the imminent prospect of being evicted from his Home.

WHEREFORE, Davis respectfully requests that this Court:

      a.     Award actual damages in an amount to be determined at trial;

      b.     Award recoverable costs and attorney's fees; and

      c.     Award such other relief as is equitable and just.


### COUNT X

### CLAIM FOR INDUCING AND PARTICIPATING IN ATTORNEY'S BREACH OF FIDUCIARY DUTY AGAINST ELITE, BROOKS AND BURNETT

168. Davis alleges and incorporates by reference paragraphs 1 through 167 as though fully set forth herein.

169. In arranging for Westerfield to appear at the April 30, 2004 closing to act as if she were Davis' attorney, while at the same time arranging for Westerfield's compensation to act in Elite's behalf and against the interests of Davis, Elite, Brooks, and Burnett induced

Westerfield to breach her fiduciary duty to Davis, and otherwise knowingly participated in Westerfield's breach of her fiduciary duty to Davis as alleged in Count IX above.

170. As a direct and proximate cause of Elite's, Brooks', and Burnett's actions in inducing and participating in such breach of fiduciary duty, Davis has suffered substantial harm, including but not limited to the loss of title to the Home, the loss of equity in the Home, the loss of the contribution to the Home equity of the monthly mortgage payments made since May 1, 2004, and the imminent prospect of being evicted from his Home.

WHEREFORE, Davis respectfully requests that this Court:

       a.    Award actual and punitive damages in an amount to be determined at trial;

       b.    Award recoverable costs and attorney's fees; and

       c.    Award such other relief as is equitable and just.

## COUNT XI

## UNJUST ENRICHMENT CLAIM AGAINST ALL DEFENDANTS PLED IN THE ALTERNATIVE TO COUNTS FOR CONTRACT RESCISION AND REFORMATION

171. Davis alleges and incorporates by reference paragraphs 1 through 170 as though fully set forth herein.

172. The money that Elite, Brooks, Burnett, Rowell, Westerfield, and Decision One Mortgage derived from the financial transactions involving Davis' Home were obtained unjustly through a course of conduct that included the following:

       a.    Defendants misled Davis into believing that if he made regular monthly payments on Rowell's mortgage for a year he would have a right to regain full and clear title to the Home when Defendants knew that, after conveying the Home at the closing to Rowell, Davis would not have any legal right to regain title to the Home by making regular monthly payments for one year;

       b.    Defendants misled Davis into believing that by making his monthly payments on Rowell's mortgage he would be adding to the equity in the Home, and

       c.     Defendants misled Davis into believing that by signing the documents Westerfield directed him to sign at the closing he would be paid $56,506.72 when in fact he received a payment of only $18,000.

173.    But for the foregoing misleading and unfair conduct by Defendants, Davis would not have signed the various documents Westerfield directed him to sign, which resulted in the purported sale of his Home and in the relinquishing of equity in the Home, (i) through his payments of monthly mortgage payments for the benefit of Rowell's equity in the Home and; (ii) through the payment of fees to Elite, Westerfield, and to other parties who also financially benefited from the purported sale of Davis' Home to Rowell.

174.    Because these Defendants' retention of the money they made off of the purported sale of Davis' Home was derived though misleading and unconscionable conduct and was, therefore, unearned, Defendants are being unjustly enriched by retaining such money.

175.    At the time of the purported transfer of title to Rowell, the Home had a fair market value substantially higher than the amount paid by or on behalf of Rowell for the Home.

176.    In addition to the foregoing potential unearned benefit, Rowell and his principals or agents retained approximately $23,246.69 in unearned benefits as a result of Davis' 20 payments on Rowell's mortgage. Rowell knowingly accepted the benefits of Davis' payments on Rowell's mortgage without providing any corresponding benefit to Davis. Rowell's retention of that money violates fundamental principles of justice, equity and good conscience.

177.    Because Davis was misled into making the purported sale of his Home to Rowell, all of the settlement payments made to effectuate that purported sale were unearned and resulted in the unjust enrichment of Brooks, Burnett, Rowell, Westerfield, and Decision One Mortgage. Their retention of such money violates fundamental principles of justice, equity and good conscience.

WHEREFORE, Davis respectfully requests this Court to enter an order requiring Defendants Elite, Brooks, Burnett, Rowell, Westerfield, and Decision One Mortgage to return to Davis all sums they derived from the subject transactions that amount to unjust enrichment.

## COUNT XII

## TRUTH IN LENDING ACT CLAIMS AGAINST ROWELL

178.   Davis alleges and incorporates by reference paragraphs 1 through 177 as though fully set forth herein.

179.   The subject transaction, though structured as a deed transfer from Davis to Rowell, is properly construed as an equitable mortgage loan, as alleged in Count III above.

180.   In 2004, Rowell was engaged in the making of equitable mortgage loans such as the subject transaction, payable by agreement in more than four installments, and for which the payment of a finance charge was required.

181.   The subject transaction is properly construed as a mortgage loan in the principal amount of $130,316.40, with required payments of $1,223.51 per month beginning in May, 2004 and running until May 1, 2005 with a final balloon payment of $175,317.88 due on June 1, 2004.

182.   Under 12 C.F.R. § 226.18 of the Truth in Lending Act ("TILA"), the amount financed on said mortgage loan is $130,316.40.

183.   Given this payoff and the above-stated terms of the mortgage loan, the annual percentage rate ("APR") of Davis's mortgage loan is 44.52 %.  12 C.F.R. § 226.18.

184.   As a result of the subject transaction, Rowell acquired an interest in Davis' Home that secures payment or performance of an obligation.

185.   The transaction between Rowell and Davis was a "consumer credit transaction" as that term is defined in the Truth in Lending Act, 15 U.S.C. 1602(h), and Regulation Z, 12 C.F.R § 226.2(a)(12).

186. The transaction between Rowell and Davis was a "closed-end credit transaction" as that term is defined in 12 C.F.R. § 226.17 through 226.24.

187. In the course of issuing a mortgage loan to Davis, Rowell committed material violations of TILA by failing to make the following disclosures required by TILA and its implementing Regulation Z, 12 C.F.R. § 226.18: APR, amount financed, finance charge, total of payments, and schedule of payments.

188. Rowell also committed a material violation of TILA by failing to provide a written notice of Davis's absolute three-day right to rescind the transaction. 12 C.F.R. § 226.23.

189. These material TILA violations give Davis an extended three-year right to rescind the equitable loan transaction, which automatically voids the lienhold interest held by Rowell, Decision One, MERS and all other purported lienholders claiming pursuant to Rowell's purported title. 15 U.S.C. §§ 1635, 12 C.F.R. § 226.23.

190. Davis exercises her right to rescind the loan pursuant to 15 U.S.C. §§ 1635 by this complaint and the attached notice of rescission served on Defendants. (**Exhibit 7.**)

191. Subsequent to rescission, Rowell must take whatever action is required to void the lien, and must take steps to ensure the return of any money or property that has been given to anyone in connection with the subject transaction, including but not limited to returning to Davis all of the monthly payments made on the loan. 15 U.S.C. § 1635.

WHEREFORE, Davis respectfully requests this Court to:

    a.    Void the mortgage lien executed in favor of Rowell;

    b.    Require Rowell to take the actions are required by 15 U.S.C. § 1635;

    c.    Award recoverable costs and attorney's fees under 15 U.S.C. § 1640; and

    d.    Award such other relief as is equitable and proper.

## COUNT XIII

## HOME OWNERSHIP AND EQUITY PROTECTION ACT CLAIM AGAINST ROWELL

192. Davis alleges and incorporates by reference paragraphs 1 through 191 as though fully set forth herein.

193. Mortgage loans are covered by the TILA amendment known as the Home Ownership and Equity Protection Act ("HOEPA") if the APR exceeds by more than 10% the applicable Treasury security yield.  15 U.S.C. 1602(aa).

194. Here, the applicable Treasury security yield was not more than 1.55% (the one-year Treasury security yield on April 30, 2004).

195. Davis's loan APR of 44.52% exceeds the applicable Treasury rate by more than 42%.

196. Because Davis's loan APR of 44.52% exceeds the applicable Treasury security yield by more than 42% Davis' mortgage loan is a high-cost loan covered by HOEPA.  15 U.S.C. §§ 1602(aa).

197. Upon information and belief, Rowell has issued one if not more similar equitable mortgage loans in 2004.

198. Upon information and belief, these mortgage loans were also covered by HOEPA.

199. Upon information and belief, Rowell issued at least two HOEPA loans within a 12 month period, and is therefore a "creditor" for the purposes of TILA.  12 C.F.R. § 226.2.

200. Because Davis's mortgage loan transaction was covered by the Home Ownership and Equity Protection Act ("HOEPA"), Rowell was required to give Davis a special cautionary notice setting forth the terms of the loan, including, *inter alia*, the APR and the required  monthly payments, three of more business days prior to the loan closing.  12 C.F.R. §§ 226.31 and 226.32.

201. Rowell did not give Davis this required notice.

46

202.    HOEPA prohibits balloon payments on covered with a term of less than five years.  12 C.F.R. § 226.32(d)(1).

203.    Because Davis's loan is covered by HOEPA and requires a balloon payment after one year, it violates the HOEPA statute.

204.    Both of the above HOEPA violations give Davis an extended three-year right to rescind the equitable loan transaction, which automatically voids the lienhold interest held by Rowell, Decision One, MERS and all other purported lienholders claiming interest pursuant to Rowell's purported title  U.S.C. §§ 1635, 12 C.F.R. § 226.23.

205.    Davis exercises his right to rescind the loan pursuant to 15 U.S.C. §§ 1635 by this complaint and the attached notice of rescission served on Defendants. (**Exhibit 7.**)

206.    Subsequent to rescission, Rowell must take whatever action is required to void the lien, and must take steps to ensure the return of any money or property that has been given to anyone in connection with the subject transaction, including but not limited to returning to Davis all of the monthly payments made on the loan.  15 U.S.C. § 1635.

WHEREFORE, Davis respectfully requests this Court to:

a.    Void the mortgage lien executed in favor of Earnest Rowell*;*

b.    Require Rowell to take whatever actions are required by 15 U.S.C. § 1635;

c.    Award an amount equal to the sum of all finance charges and fees paid by Davis and costs and attorney's fees under 15 U.S.C. § 1640; and

d.    Award such other relief as is equitable and proper.

<u>s/John S. Elson</u>
Plaintiff's Attorney

John S. Elson
Attorney No. 23460
Northwestern University Legal Clinic
357 East Chicago Avenue
Chicago, Illinois  60611
(312) 503-8576